MICHAEL C. MIKULIC (Florida Bar No. 125073)
 Email: mikulicm@sec.gov
JEFFREY B. GOLDBERG (Florida Bar No. 118689)
 Email: goldbergj@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 982-6300

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>BRIAN KUZDAS and JOHN ROWLAND,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.      From approximately April 2018 through January 2025 (the "Relevant Period"), Defendants Brian Kuzdas ("Kuzdas") and John Rowland ("Rowland") (collectively, "Defendants") engaged in a fraudulent securities offering in which they raised around $65 million from nearly 350 retail investors nationwide to finance the construction and operation of "MegaFactories" across the United States. These MegaFactories, once operational, would manufacture and assemble "modular" units—essentially, separate sections of a commercial building or residential home—in a controlled environment. Defendants would then ship these modular units on site for full assembly.

COMPLAINT
*SEC v. KUZDAS ET AL.*

2.     To raise money for these MegaFactories, Defendants first solicited retail investors. Defendants told investors to choose a specific MegaFactory they wished to fund. This choice was critical. Defendants promised to pay investors distributions only from the profits generated by the specific MegaFactory they funded.

3.     While Defendants publicly promoted investments in specific MegaFactories, Defendants simultaneously—without investors' knowledge—reallocated substantial portions of investor capital in ways that contradicted their offering materials and communications. Rather than applying funds as promised to the specific MegaFactory investors chose, from May 2021 through December 2022, Defendants diverted a substantial portion of those funds to a single facility located in Patterson, California (the "Patterson MegaFactory").

4.     For a time, Defendants did not disclose that they were diverting investor funds to the Patterson MegaFactory, rather than the MegaFactories that investors had selected. And later, Defendants pressured investors to "Roll-Up" their investments into a larger entity or risk losing their investments entirely.

5.     Additionally, Defendants attempted to prop up their fundraising with inflated claims about customer demand and institutional financing. Utilizing webinars, written updates, and in-person presentations, Defendants raised capital by presenting a version of their companies' prospects and financial structures that misrepresented reality.

6.     Defendants overstated both the number of customer contracts secured for modular projects and the extent of customer demand. For instance, Defendants claimed as early as 2020 that they had over 600 units under contract when they did not and claimed throughout 2022 and 2023 to have even more "on order," without disclosing that the orders were not binding. Defendants, however, recognized at the time of their misrepresentations that they could not commence production of modular units until the Patterson MegaFactory, their most advanced facility, obtained a certificate of occupancy. The Patterson MegaFactory did not receive a certificate of occupancy until January 2024. Ultimately, Defendants obtained only about 100 contracts by the end of 2024.

COMPLAINT
*SEC v. KUZDAS ET AL.*                                    2

7.      Similarly, from 2022 through early 2025, Defendants repeatedly touted the imminent arrival of massive institutional capital raises, including purported billion-dollar investments.  Defendants, however, knew that they never progressed beyond preliminary discussions and such institutional investment could not—and would not—materialize because Defendants needed but refused to audit their companies.

8.      Defendants knew or should have known that their statements about the use of investor funds, customer contracts, and institutional investments were false or misleading.

9.      By engaging in the misconduct alleged in this Complaint, Defendants each violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.      Unless enjoined, Defendants are reasonably likely to engage in future violations of federal securities laws.  Among other relief, the Commission seeks permanent injunctions, civil monetary penalties, and officer and director bars against Defendants.

## JURISDICTION AND VENUE

11.      The Commission brings this action and this Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), 77t(e), and 77v(a)], and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].  Furthermore, Defendants have consented to the Court's jurisdiction.

12.       Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business that the Commission alleges herein.

13.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District.  For example, during the Relevant Period of violative conduct alleged in this Complaint, Kuzdas resided in this District in Palo Alto,

California. In addition, many of the entities that Defendants used in connection with their violations were also based in this District: S2A Modular Corp. and S2A Investments 2, LLC in Patterson, California; and S2A Investments, LLC and S2A Investments 5, LLC in Palo Alto, California. Furthermore, Defendants offered and sold securities to at least two dozen retail investors who resided in this District during the Relevant Period, including in the Counties of Santa Clara, San Francisco, Alameda, and San Mateo. Kuzdas also met in person with investors in the County of San Mateo, some of whom shortly thereafter invested in S2A Investments, LLC.

## DIVISIONAL ASSIGNMENT

14. Under Civil Local Rules 3-2(c) and 3-5(b), this action should be assigned to the San Jose Division because a substantial part of the events and omissions which give rise to the claims alleged herein occurred in the County of Santa Clara, California.

## DEFENDANTS

15. **Kuzdas**, age 62, resides in Palo Alto, California. He is the co-founder and Chief Executive Officer ("CEO") of S2A Modular Corp. ("S2A Modular") and the five investment companies at issue: S2A Investments, LLC; S2A Investments 2, LLC; S2A Investments 5, LLC; S2A Investments 9, LLC; S2A Investments 36, LLC (collectively, the "Investment LLCs"). He and Rowland owned equal controlling shares (each 50%) in Modular Green Management Headquarters, LLC ("MGM HQ"), which in turn controls S2A Modular and which served as the manager of the Investment LLCs. In May 2025, Kuzdas purchased Rowland's interest in MGM HQ and assumed sole management rights of MGM HQ.

16. **Rowland**, age 55, resides in Huntington Beach, California. Rowland was co-founder and President of S2A Modular and the Investment LLCs. Until May 2025, he and Kuzdas owned equal controlling shares in MGM HQ, which controls S2A Modular and which served as manager to the Investment LLCs. Rowland served as President of the Investment LLCs before selling his interest in MGM HQ to Kuzdas in May 2025 and relinquishing all operational responsibilities at that time.

COMPLAINT
*SEC V. KUZDAS ET AL.*                4

**RELEVANT ENTITIES**

17.    **S2A Modular** is an active Delaware corporation formed in 2022 with its principal place of business in Patterson, California.  Shortly after its formation, S2A Modular became the parent and management company to the Investment LLCs (S2A Modular and the Investment LLCs are collectively referred to as the "S2A Entities") and began offering equity shares to investors.  At all relevant times, Kuzdas and Rowland held controlling voting shares and served as the CEO and President, respectively, of S2A Modular.

18.    **MGM HQ** is an active Delaware corporation formed in 2021 with its principal place of business in Macclenny, Florida.  MGM HQ served as manager to the Investment LLCs prior to 2023 and was majority owned by Defendants during most of the Relevant Period, until Rowland sold his shares to Kuzdas in May 2025.  MGM HQ holds a 50.1% equity interest in S2A Modular and all of its voting shares.

19.    **S2A Investments, LLC** ("S2A 1/Hemet/Waco") is an inactive Delaware limited liability company formed in 2018 with its principal place of business in Palo Alto, California.  Defendants originally pitched a MegaFactory in Hemet, California, but pivoted to one in Waco, Texas.  S2A 1/Hemet/Waco became a subsidiary of S2A Modular in 2023 and is no longer operational, with its property sold in 2023.

20.    **S2A Investments 2, LLC** ("S2A 2/Patterson") is an active Delaware limited liability company formed in 2019 with its principal place of business in Patterson, California.  S2A 2/Patterson became a subsidiary of S2A Modular in 2023 and is the company's only operational subsidiary, with a MegaFactory currently accepting orders for modular homes.

21.    **S2A Investments 5, LLC** ("S2A 5/Hemet") is an inactive Delaware limited liability company formed in 2020 with its principal place of business in Palo Alto, California.  S2A 5/Hemet became a subsidiary of S2A Modular in 2023 and is no longer operational, with its property sold in 2023.

22.    **S2A Investments 9, LLC** ("S2A 9/Macclenny") is an inactive Delaware limited liability company formed in 2020 with its principal place of business in St.

Petersburg, Florida.  S2A 9/Macclenny became a subsidiary of S2A Modular in 2023 and is no longer operational.

23.   **S2A Investments 36, LLC** ("S2A 36/Punta Gorda") is an inactive Delaware limited liability company formed in 2021 with its principal place of business in St. Petersburg, Florida.  S2A 36/Punta Gorda became a subsidiary of S2A Modular in 2023 and is no longer operational.

## FACTUAL ALLEGATIONS

### A. Defendants Raised Millions of Dollars for Their MegaFactories by Issuing Securities Through the Investment LLCs and Later, S2A Modular

24.   In Defendants' raise of the approximately $65 million from nearly 350 retail investors nationwide to fund the construction of the MegaFactories through a series of private placement securities offerings during the Relevant Period—first through the Investment LLCs and later S2A Modular—Defendants promoted an ambitious plan to construct a nationwide network of high-capacity manufacturing facilities.

25.   As described in one investor offering, a private placement memorandum ("PPM"), "Modular construction is a process that builds 80%-90% of a building in a factory and the remainder on-site, as opposed to traditional 'site-built' methods in which most construction is performed [at the physical construction location]."  That same PPM touted the many alleged benefits of modular building, including faster construction, more cost savings, and better quality control as compared to traditional on-site-built methods.

26.   Before the Roll-Up, from approximately April 2018 through January 2023, Defendants conducted separate capital raises by selling membership interests in each of the Investment LLCs.  Defendants represented to investors that each Investment LLC would own and operate a single, designated MegaFactory.  Defendants attempted raises for up to thirty-six MegaFactories across the United States, ultimately focusing on five located in Hemet, California; Patterson, California; Waco, Texas; Macclenny, Florida; and Punta Gorda, Florida.  In February 2023, Defendants initiated the Roll-Up, consolidating the Investment

LLCs' funds into one company: S2A Modular.  The Roll-Up concluded one month later in March 2023.

27.     While initially raising funds for the Investment LLCs, Defendants solicited investors in a variety of ways, including in-person meetings, online webinars, online shareholder meetings, and written shareholder updates.  In addition, through these mediums, Defendants updated investors on the construction progress of the five MegaFactories and claimed there was significant demand for modular units and substantial interest from institutional investors.

28.     Defendants approved the contents of the PPMs and then issued them to investors and prospective investors.  The PPMs laid out how investor funds would be used and identified the MegaFactory each investment would fund.

29.     The PPMs identified the membership interests that investors purchased in the Investment LLCs as securities.  For example, the first page of the S2A 9/Hemet/Waco PPM states, "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933[.]"

30.     Defendants also told investors in the PPMs that "[w]e intend on returning 100% of the original capital by approximately [less than two years], or as close to that date as practicable."  Defendants repeated this during several online meetings with investors.  For instance, during a live webinar on October 11, 2022, Kuzdas told investors that they should "conservatively" expect to receive their original capital "in the next 24 months.  And that's of course the most important thing on this entire call."

31.     According to the PPMs, after investors received their original capital back, "the remaining cash flow [would] be divided 50% to go toward the growth of the company and 50% of capital to shareholder quarterly distributions."  Investors' profits depended solely on the performance of the specific Investment LLC and corresponding MegaFactory they funded and which Defendants managed.

32.     Once investors selected a specific Investment LLC and MegaFactory to fund, they signed a subscription agreement and received membership interests in the form of non-

COMPLAINT
*SEC V. KUZDAS ET AL.*                                        7

voting shares in that Investment LLC. These subscription agreements, in which investors received membership interests, qualified as securities in the form of investment contracts. Investors contributed capital to participate in the offerings, thereby risking financial loss. Each Investment LLC was supposed to pool its investors' funds, and in the event there were profits they would be allocated to investors on a pro rata basis. Defendants, however, commingled investor funds across the various Investment LLCs.

33.    During the Relevant Period, Defendants exercised control over the Investment LLCs' finances and bank accounts. The same is true for the later company they formed, S2A Modular. Indeed, Defendants ran and managed the S2A Entities, owned membership interests in the Investment LLCs, owned stock in S2A Modular, and received management and consulting fees for their work on behalf of the S2A Entities. Defendants possessed controlling interests in the S2A Entities through their controlling interests in their management companies, including MGM HQ.

34.    Investors relied solely on Defendants and the S2A Entities they controlled to generate profits by selling modular units produced at the MegaFactories. Investors had no legal or actual control over the S2A Entities, nor were they involved in the operation of the MegaFactories.

### B. Pre-Roll-Up, Defendants Made Material Misrepresentations While Soliciting Investments from Retail Investors

35.    While raising investment funds for the Investment LLCs and then S2A Modular, Defendants each knowingly made material misrepresentations to individual investors concerning the use of investor funds, the amount of customer contracts and demand for modular projects, and the prospects for institutional investment. Defendants made these material misrepresentations knowing they were false.

#### i. Misrepresentations Concerning Use of Investor Funds

36.    From approximately May 2021 through at least December 2022, Defendants informed investors and prospective investors in PPMs, online presentations, and written

materials that investor funds would be used only for the respective Investment LLC and MegaFactory investors chose.

37.    The offering documents for each Investment LLC, which Defendants each approved, described the use of proceeds for investor funds.  They explicitly detailed how Defendants, through the Investment LLCs, planned to use investor funds to secure a specific location (either an existing site or an approximate location) for a MegaFactory.  For instance, with language substantially similar to the PPMs of other Investment LLCs, the June 2021 PPM for S2A 36/Punta Gorda states:

> The proceeds raised through the offer and sale of the Units will be used for the purposes of constructing a "MegaFactory" of MGM, which will be wholly-owned and operated by S2A Investments 36.  Offering proceeds will be spent on the acquisition of the land on which the MegaFactory will be built, the construction of the facility, and its operation in MGM's modular construction process thereafter.
>
> S2A Investments 36, LLC plans to acquire a 25-50 acre industrial parcel strategically located near major interstate freeways[,] likely in the Southwest Florida metro area.  The total budget to acquire the parcel is budgeted up to four million dollars ($4 million).  The following table is a breakdown of our expected use of proceeds if the maximum amount of $20,000,000 is raised in the offering.

38.    The S2A 36/Punta Gorda PPM went on to state that "S2A Investments 36, LLC shall acquire a 32-acre industrial parcel strategically located at 27550 and 27580 Jones Loop Road, Punta Gorda, FL 33982."  It also included an aerial photograph showing where the MegaFactory would be located.  Many of the other PPMs, such as for S2A 5/Hemet and S2A 9/Macclenny, similarly detailed the exact MegaFactory location.

39.    Defendants also told investors during various live webinars that their investments were tailored to a specific MegaFactory.  In a live webinar on May 24, 2022, Rowland updated investors on the five MegaFactories' construction progress, treating each separately and noting their different locations on a map.  He set the stage for Kuzdas to then explain the remaining investment opportunities tied to each specific MegaFactory, with Kuzdas remarking, "In Waco, Texas, we have a total of $1 million left in shares . . . . [O]n

S2A5, we've got about $10 million left in that and we've got about $10 million left in S2A36, which is Southwest Florida."

40. In another live webinar in early 2022, Kuzdas described to investors exactly how their money would fund the construction of a particular MegaFactory and stated that their investments were limited to only the specific MegaFactory they chose unless they met the minimum investment threshold for investing in a second MegaFactory. He explained, "each one of the factories that we build, they have . . . their own LLC, it's their own investor group. So you're welcome to invest in multiple factories, but . . . each factory [has] a lowest denomination . . . and that's $200,000 that gives you a half a percent ownership in that factory."

41. Defendants emphasized the same in written updates to investors. In a letter dated April 5, 2022, which Defendants emailed to investors, Kuzdas wrote that retail offerings were tied to specific MegaFactory locations. In another letter dated August 16, 2022, Kuzdas reminded investors that "you are invested in a single LLC in a factory location and thus if you remember all benefits are tied to the performance of that one factory."

42. MegaFactory location was important to investors. Many invested in MegaFactories near where they lived so that they could see the construction progress for themselves. Others believed that certain locations would make MegaFactories more likely to succeed or yield faster results than other locations.

43. However, despite Defendants' repeated representations that investor funds were tied to the specific MegaFactory of their choosing, Defendants diverted funds away from the investors' selected Investment LLCs toward S2A 2/Patterson, without telling investors.

44. And though from May 2021 through December 2022, Defendants maintained separate bank accounts for each Investment LLC and investors initially wired funds to the Investment LLC tied to their chosen MegaFactory, nevertheless, during this time, Defendants transferred more than $20 million from those accounts into a single account titled "S2A Modular Headquarters Corporation" ("S2A Modular HQ Account"). Defendants then

redirected more than $8 million from the S2A Modular HQ Account to S2A 2/Patterson's bank account to finance construction of the Patterson MegaFactory. Although Defendants previewed the Roll-Up in 2022, at no time before December 2022 did they modify the PPMs or otherwise inform investors that they were diverting investors' funds to the Patterson MegaFactory.

### ii.    Misrepresentations Concerning Customer Contracts and Demand

45.    During numerous online investor presentations and in written materials distributed to investors from at least 2020 through 2023, Defendants repeatedly told investors and prospective investors that the Investment LLCs and later S2A Modular had hundreds of contracts with customers to construct modular units—even though Defendants knew that this was not the case. Relatedly, Defendants painted a picture of overwhelming customer demand in an effort to drum up additional investments, claiming they had hundreds of units "on order" when that was not true.

46.    To further this scheme, Kuzdas told investors in a 2020 live webinar: "We have in excess of over 600 units that . . . are under contract right now for a California build." His statements regarding units "on order" were even greater. During a live webinar in early 2022, the Chief Revenue Officer, using data provided by Kuzdas, told investors they now had "900 plus units on order," and noted the number was actually "even beyond that, way beyond that." In yet another live webinar in 2022, Kuzdas stated that "we've got 271 orders" for the Patterson MegaFactory.

47.    Rowland reinforced these claims, telling investors in a live May 24, 2022, online presentation that "just in Florida alone, we've got over 1000 units to build," while in "Texas . . . [w]e probably got about 500 units that we need to build." He then told investors in a July 2023 webinar that "we've got 155 units in Prescott, Arizona that we have to have our final paperwork into the company by next Thursday," and later, at a November 2, 2023, live webinar, they "just came to terms on a 195-unit project in Sacramento."

48.     These purported contracts and units on order were important for soliciting investors because, as Kuzdas recognized at an online meeting in 2019 with investors, "orders are contracts, money in the bank, deposits, signed contracts."

49.     Yet, despite their misrepresentations over several years regarding customer contracts and demand, Defendants knew S2A Modular never had hundreds of contracts for modular units.  The "orders" were not binding, and S2A Modular had, at most, only about 100 contracts as of the end of 2024.

50.     Furthermore, Defendants knew that S2A Modular could not commence production of any units until the Patterson MegaFactory, the facility closest to completion, received a certificate of occupancy from California.  Defendants, despite making claims for years that they had hundreds of contracts, did not obtain this certificate until January 17, 2024.

### iii.    Misrepresentations Concerning Prospects for Institutional Investment

51.     In addition, Defendants provided an inflated assessment of the amount of institutional investments they expected to receive through the S2A Entities.

52.     Starting in 2022, Defendants sought institutional investment to help fund MegaFactory construction.  However, when soliciting retail investment, they misrepresented the prospects for obtaining such institutional funding by repeatedly claiming that such funding was imminent.

53.     In an April 5, 2022, written shareholder update, Defendants asked investors to contact them "as soon as possible" because they anticipated raising $400 million from institutional investors between July 2022 and October 2022, and retail investment would not last.  Per the update, "a flurry of institutional investors" were approaching S2A Modular.

54.     In a live May 24, 2022, webinar, Kuzdas went further and told investors that with respect to raising this $400 million, they had "verbal commitments to the entire $400 million" from institutional investors.

COMPLAINT
*SEC V. KUZDAS ET AL.*                                 12

55.    In another live webinar on July 6, 2022, Rowland informed investors, "we're holding a contest basically right now similar to like what, you know, Tesla and some of the companies have done as far as trying to see, you know, who wants us the most. . . .  And in January we're going to pick and announce the first two locations where we plan to break ground next year."

56.    On August 16, 2022, with no institutional investment materializing, Defendants again sent a written update to investors asking them for more funds as they "projected . . . institutional funding to be in a range of about $1.5B over the next 18 months for 30-factory locations."

57.    Still, Defendants did not secure any institutional investment by the time of the Roll-Up.  But they continued to solicit retail investments by way of their aforementioned misrepresentations.  The following chart shows the amounts Defendants raised through each of the Investment LLCs as of February 2023, which is when the Roll-Up occurred:

| Investment LLC (Issuer) | Year Capital First Raised | Amount Raised Through February 2023 |
| --- | --- | --- |
| S2A 1/Hemet/Waco | 2018 | $14,676,541 |
| S2A 2/Patterson | 2020 | $15,240,000 |
| S2A 5/Hemet | 2021 | $7,230,000 |
| S2A 9/Macclenny | 2020 | $14,415,000 |
| S2A 36/Punta Gorda | 2022 | $7,600,000 |

58.    As the chart shows, Defendants raised millions of dollars from retail investors for each of the Investment LLCs pre-Roll-Up—totaling over $59 million.

## C.  Defendants Consolidated Investors into S2A Modular Through the Roll-Up and Continued to Raise Money

59.    Although Defendants raised over $59 million through the Investment LLCs by February 2023, Defendants underestimated the cost to build the MegaFactories and faced liquidity challenges.  Defendants thus continued to solicit investments from new and existing investors and decided to restructure their business.

COMPLAINT
*SEC V. KUZDAS ET AL.*                13

60.     Rather than operate the Investment LLCs as multiple corporate entities, Defendants consolidated the Investment LLCs into the newly formed S2A Modular.

61.     In February 2023, Defendants began the Roll-Up.  To accomplish it, they pressured investors to sign "contribution agreements" exchanging investors' membership interests in the Investment LLCs for shares of S2A Modular stock.

62.     Defendants then issued multiple rounds of PPMs through S2A Modular and solicited additional investments from new and existing investors.  These investors signed subscription agreements in which they bought shares of S2A Modular in exchange for quarterly distributions once the company became profitable.  Defendants raised approximately $5,065,000 through S2A Modular between February 2023 and December 2024.

63.     Despite these fundraising efforts, Defendants only ever built one MegaFactory in Patterson, California, during the Relevant Period.

64.     Like with the Investment LLCs, Defendants retained controlling shares of S2A Modular through their ownership of MGM HQ, which controlled and managed S2A Modular.

65.     The stock that investors purchased in S2A Modular, which they obtained through the subscription and contribution agreements, qualifies as a security.  Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] define "security" to include "stock."

**D. Post-Roll-Up, Defendants Made Additional Material Misrepresentations Concerning Institutional Demand**

66.     After Defendants concluded the Roll-Up in March 2023, they continued to falsely represent their prospects for institutional investment into S2A Modular.  In a live online shareholder meeting on July 26, 2023, Kuzdas prepared a script, read by the company's Chief Revenue Officer, telling investors that "we've had institutions knocking on our door for quite some time," and that they had signed letters of intent with institutional investors worth $110 million.

67. In a recorded webinar with investors on April 24, 2024, the Chief Revenue Officer, again reading a script prepared by Kuzdas, told investors they had "about $3 billion in the institutional pipeline."

68. In an October 3, 2024, recorded shareholder update, Kuzdas again told investors that "institutional funding is right at the doorstep."

69. At another online meeting on January 22, 2025, Rowland informed investors that S2A Modular was in discussions with a foreign government for institutional investment, which "ha[d] moved to the forefront" of their international projects, and had "agreed to move forward to do a factory there." Rowland then detailed a proposal to purchase one MegaFactory for $60 million and another proposal for a $250 million exclusive licensing deal to hold MegaFactory rights throughout the region. While admitting these projects would not happen immediately, Rowland said they "are going to make it to fruition." Later in the same meeting, Kuzdas declared that this foreign government had "signed a[] [letter of intent] and now they're going to contract on $6.4 million of construction. So that's another deal in the pipeline that's going to contract."

70. While Defendants each made repeated promises over the course of many years regarding imminent institutional investment, they knew that such institutional investment was not, in fact, "at the doorstep." Instead, Defendants purposefully misrepresented the prospects of institutional investment to try and shore up even more retail investment. With demand described as "so ridiculous in every city, county, state across the US and internationally," Kuzdas urged retail investors at an August 28, 2024, live webinar to invest any available funds—including IRA rollovers, 401(k)s, IRAs, and Roth accounts—before institutional investors appeared on scene. Two months later, in October 2024, he repeated the same message at a webinar, telling retail investors "institutional funding is right at the doorstep" before advising them to "use IRA, IRA rollovers, 401(k)s" to invest before institutional investors.

71. However, the letters of intent with institutional investors were, by definition, preliminary discussions—not imminent investment.

72. Further, the potential investment referenced in the letters of intent was unlikely to materialize because S2A Modular lacked audited financials performed by an independent third-party auditor, something Kuzdas recognized was typically necessary to secure institutional investment. In fact, during an October 11, 2022, live webinar with investors, which Kuzdas and Rowland attended, an advisor to S2A Modular told investors that an audit was "extremely important" for securing institutional funds. Yet, despite receiving management and consulting fees, Defendants never commissioned an independent audit of their company's financials during the Relevant Period, even though their Chief Revenue Officer implored them to do so.

73. Despite the many claims of institutional demand, Defendants never secured institutional investment in the S2A Entities during the Relevant Period.

## CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

**(Against Both Defendants)**

74. The Commission re-alleges and incorporates by reference Paragraphs 1 through 73.

75. During the Relevant Period, Kuzdas and Rowland, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of means of instrumentalities of interstate commerce, or of the mails, with scienter:

   i.    employed devices, schemes, or artifices to defraud;

   ii.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   iii.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

76.     By reason of the foregoing, Kuzdas and Rowland violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violation of Section 17(a) of the Securities Act

### (Against Both Defendants)

77.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 73.

78.     During the Relevant Period, Kuzdas and Rowland, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    i.     with scienter, employed devices, schemes, or artifices to defraud;

    ii.     obtained money or property by untrue statements of material fact or by omitting to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; and

    iii.     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

79.     By reason of the foregoing, Kuzdas and Rowland violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter an order permanently enjoining Kuzdas and Rowland from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)].

## II.

Enter an order requiring Kuzdas and Rowland to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## III.

Enter an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring Kuzdas and Rowland from acting as an officer or director of an issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that files reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IV.

Grant such other and further relief as this Court may determine to be just and necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 3-6, the Commission demands a trial by jury on all issues so triable.

Dated: July 23, 2026

Respectfully submitted:

By:  /s/ Michael C. Mikulic
Michael C. Mikulic
Jeffrey B. Goldberg
Attorneys for Plaintiff
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300

COMPLAINT
*SEC V. KUZDAS ET AL.*                    18